STATE OF VERMONT
ENVIRONMENTAL COURT

|                                      | }   |                        |
|--------------------------------------|-----|------------------------|
| **South Village Communities, LLC**   | }   | **Docket No. 74-4-05 Vtec** |
| **(Appeal of Vallee)**               | }   | **(Master Plan Appeal)** |
|                                      | }   |                        |

## Decision on Pending Motions

Skip and Denise Vallee appealed from a decision of the City of South Burlington (City) Development Review Board (DRB) dated March 10, 2005[1] granting final approval to South Village Communities, LLC's Master Plan Application (#MP-04-01) for a planned unit development in the City's Southeast Quadrant Zoning District. Appellants are represented by Jon T. Anderson, Esq.; Appellee-Applicant South Village Communities, LLC is represented by Mark G. Hall, Esq.; the City appears as an Interested Person and is represented by Amanda Lafferty, Esq.; Interested Person Daniel M. Wetzel represents himself. Appellants have filed a motion for partial summary judgment, which South Village opposes. Appellee-Applicant filed a motion to dismiss. The pending motions focus our attention on the applicability of a mixed rate housing density bonus for development in the Southeast Quadrant Zoning District.

## Appellee-Applicant's Motion to Dismiss

Appellee-Applicant moves to dismiss this appeal based on Appellants' failure to file the Statement of Questions within twenty days after filing the notice of appeal, as required by V.R.E.C.P. 5(f).[2] If we do not grant the motion to dismiss, Appellee-Applicant seeks, in the alternative, a ruling limiting the issues in this appeal to the sole issue presented in Appellants'

---

[1] On April 13, 2005, Appellee-Applicant filed an unopposed motion to remand to allow the DRB to reconsider its March 10, 2005 DRB decision. This Court granted the remand, with leave to reopen, on April 14, 2005. The DRB issued a reconsidered decision on July 19, 2005, in which it came to the same conclusion as it had on March 10. On August 3, 2005, Appellants filed a "notice of continued appeal." It thus appears that the decision being appealed here is the March 10, 2005 DRB decision. However, any distinctions between the March 10 and July 19 DRB decisions are not material to our decision on the pending motions.

[2] V.R.E.C.P. 5(f) states in its entirety:

> Within 20 days after the filing of the notice of appeal, the appellant shall file with the clerk of the Environmental Court a statement of the questions that the appellant desires to have determined. The statement shall be served in accordance with Rule 5 of the Vermont Rules of Civil Procedure. No response to the statement of questions shall be filed. The appellant may not raise any question on the appeal not presented in the statement as filed, unless otherwise ordered by the court in a pretrial order entered pursuant to subdivision (d) of Rule 2. The statement is subject to a motion to clarify or dismiss some or all of the questions.

motion for partial summary judgment. The operative notice of appeal in the somewhat convoluted procedural history of this case is the Notice of Continued Appeal filed by Appellants on August 3, 2005. At that time, the parties expected that an Act 250 application would be filed in connection with the project at issue in this appeal. On August 18, 2005, this Court ordered that the current appeal, Docket No. 74-4-05 Vtec, "be placed on inactive status in this Court until any Act 250 application filed for this project is decided and appealed to this Court, or until further Order of the Court." Scheduling Order in Docket Nos. 163-9-04 Vtec and 74-4-05 Vtec, dated August 18, 2005, at 2. On September 20, 2005, Appellee-Applicant acknowledged that the Court's August 18, 2005 Order tolled the time period for initial filings, in a letter requesting that "the appeal [Docket No. 74-4-05 Vtec] be removed from inactive status so that the initial procedures for filing the statement of questions and issues related to the parties can go forward. . . . none of the initial time periods for narrowing issues and participation are running." Appellee-Applicant's letter dated Sept. 20, 2005.

This appeal, Docket No. 74-4-05 Vtec, was not removed from inactive status until January 3, 2006. Between August 18, 2005, and January 3, 2006, during which time this appeal was on inactive status, the time limits for initial filings were tolled, and Appellants' failure to file a Statement of Questions during that period is of no legal effect, especially since Appellants were assured by Court staff on October 24, 2005 that the Statement of Questions was not yet due. Despite the inactive status of this appeal, the parties proceeded to file the pending motions: Appellants' motion for partial summary judgment was filed on October 31, 2005, and Appellee-Applicant's motion to dismiss and reply memorandum was filed on November 29, 2005. This resulted in an unusual situation where the pre-trial motions preceded the filing of Appellants' Statement of Questions.

Perhaps motivated by Appellee-Applicant's motion to dismiss, Appellants filed a Statement of Questions for this appeal on December 21, 2005. Given the circumstances, Appellants' filing of their Statement of Questions is wholly sufficient to satisfy the requirements of V.R.E.C.P. 5(f). We therefore conclude that Appellee-Applicant's motion to dismiss should be denied. Nor will we grant its alternative request to limit the issues on appeal to the issue raised in Appellants' motion for partial summary judgment. The placing of this appeal on inactive status tolled the twenty-day period for filing the Statement of Questions. Therefore,

2

Appellants' Statement of Questions, which was filed while this appeal was still on inactive status, was timely.

**Appellants' Motion for Partial Summary Judgment**

Appellants seek partial summary judgment on the sole issue of whether open space and natural area protection can be reduced in the Southeast Quadrant Zoning District to allow a housing density of more than 1.2 housing units per acre. This is a question of pure law, which we must resolve by applying the language of the relevant sections of the City of South Burlington Land Development Regulations (SBLDR).

Section 9.01 of the SBLDR states the purpose of the SEQ:

> A Southeast Quadrant Zoning District (SEQ) is hereby formed in order to encourage open space preservation, scenic view and natural resource protection, wildlife habitat preservation, continued agricultural use, and well planned residential use in the largely undeveloped area of the City known as the Southeast Quadrant. The open character and scenic views offered in this area have long been recognized as very special and unique resources in the City and worthy of protection. The location and clustering of buildings and lots in a manner that in the judgment of the Development Review Board will best preserve the open space character of this area shall be encouraged. Any uses not expressly permitted are prohibited except those which are allowed as conditional uses.

Development in the SEQ is subject to restrictions designed to further the purposes outlined in SBLDR § 9.01. Our reading of the SEQ protections, together with the PUD allowances for the other zoning districts, leads us to conclude that planned unit developments in the SEQ district do not qualify for the same housing density bonuses that apply in the other zoning districts.

In the Residential 2 District, where, pursuant to SBLDR Table C-2, the maximum residential density is two units per acre, SBLDR § 4.02(F) provides that "[f]or lots within the Residential 2 District that are five (5) acres in size or more, a Planned Unit Development may be permitted at a maximum of four (4) units per acre," or twice the otherwise applicable maximum density. In the Residential 1 District, where, pursuant to SBLDR Table C-2, the maximum residential density is one unit per acre, SBLDR § 4.01 provides that "a Planned Unit Development may be permitted at a maximum of four (4) units per acre." In the SEQ, however, "[t]he maximum development density for residential development of a parcel of land or portion of a parcel of land . . . shall be one point two (1.2) residential units per acre," SBLDR § 9.05(A),

and "[n]o parcel of land or portion thereof . . . shall be developed for a greater number of residential units or residential lots than allowable under Section 9.05(A)." SBLDR § 9.05(B).[3]

Even if a planned unit development is proposed in the SEQ, "[t]he maximum number of residential units or lots that may be approved for a PUD shall not exceed the allowable residential development density for the property determined in accordance with Section 9.05," SBLDR § 9.08(C).

Appellants cite to SBLDR § 15.18(B)(2) for support of the proposition that open space and natural area protection can only be reduced in the SEQ to allow development at a density of no more than 1.2 units per acre. SBLDR § 15.18(B) requires a PUD or Master Plan in the SEQ to comply with seven numbered standards, in addition to the general standards applicable to all PUDs. SBLDR § 15.18(B)(2) states that "[b]uilding lots, streets, and other structures shall be located in a manner that maximizes the protection of the open character, natural areas, and scenic views of the Quadrant identified in the Comprehensive Plan, while allowing carefully planned development at the overall base densities provided in these regulations." The "base densities" in the SEQ appear to be identical to the "maximum allowable density," that is, 1.2 units per acre (but see n. 3, supra).

Appellee-Applicant argues that SBLDR § 15.18(B)(2) addresses the location of lots, street, and structures, "while saying nothing about allowable densities." Mot. to Dismiss and Mem. in Opp'n, at 7. While acknowledging that SBLDR § 15.18(B)(2) contains the phrase "while allowing carefully planned development at the overall base densities provided in these regulations," Appellee-Applicant asserts that the section "does not substantively address density," because this phrase "serves only as a supporting, descriptive clause." We disagree. Section 15.18(B)(2) does address density, requiring the DRB to maximize open space and natural area protection, while at the same time "allowing carefully planned development at the overall base densities provided in these regulations." Taken by itself, SBLDR § 15.18(B)(2) would not authorize development at densities greater than 1.2 units per acre. However, our analysis does not end with § 15.18(B)(2).

---

[3] SBLDR § 9.05(C) provides a four unit per acre limit for units or single family dwelling lots "within the limits of a contiguous designated development area located within a single parcel of land." The term "designated development area" is undefined, but it appears that the intent is to allow a developer to cluster units within a single parcel in the following fashion: development of a 10-acre parcel is limited to 12 units (1.2 units per acre), but those units may be concentrated on a designated portion of the 10-acre parcel, so long as the concentration does not exceed four units per acre within that designated area.

Appellee-Applicant argues that if SBLDR § 15.18(B)(2) addresses density, it does so in a general way. Noting the established rule of statutory construction that the more specific provision controls over the more general provision, Appellee-Applicant identifies SBLDR § 13.14, relating to density bonuses for affordable housing, as "the most specific provision addressing increased zoning density," Mot. to Dismiss and Mem. in Opp'n, at 8. Sections 13.14(C) and (D) identify the standards and criteria the DRB must consider, "on a case by case basis," when reviewing applications for a below market rate housing density bonus. Section 13.14(C)(2) addresses bonuses for "mixed rate housing development," which is the type of bonus sought by Appellee-Applicant here. Section 13.14(C)(2) reads as follows:

> Mixed Rate Housing Development. The Development Review Board may grant a density increase of no more than twenty-five percent (25%) in the total number of allowed dwelling units for a Mixed Rate Housing Development. For each additional market-rate dwelling unit produced as a result of the density increase, one (1) comparable below market rate unit must be provided. Such application shall be subject to Article 15, Planned Unit Development and Article 14, Site Plan and Conditional Use Review.

Section 13.14(D)(1) implicitly provides that the below market rate housing density bonus generally allows development at densities greater than the maximum allowable density for the applicable district ("The density upon which a bonus may be based shall be the total acreage of the property in question multiplied by the maximum residential density for the applicable zoning district"). The regulations make an exception for the R-1 and R-2 zoning districts, where "the maximum allowable residential density with or without such a density increase shall be four (4) dwelling units per acre," SBLDR § 13.14(D)(2), which is the maximum density allowed for PUDs in those districts pursuant to SBLDR §§ 4.01(F) and 4.02(F). It is somewhat incongruous that an exception limiting the application of the density bonus is explicitly made in § 13.14 for the R-1 and R-2 districts, and not explicitly made for the SEQ district, considering that development in the SEQ is otherwise subject to more stringent limitations than other districts. For example, the allowable density is increased for PUDs in the R-1 and R-2 districts, SBLDR §§ 4.01(F) and 4.02(F), but not increased for PUDs in the SEQ, SBLDR § 9.08(C).

We conclude that no explicit exception is made in SBLDR § 13.14 limiting the application of a below market rate housing density bonus in the Southeast Quadrant district because none is necessary. Pursuant to SBLDR § 9.08(A), a proposal for a PUD in the SEQ "shall be reviewed under the standards of this Article (Article 9) and the standards set forth in

Article 15." The plain language of Article 9 limits development density to 1.2 units per acre, with one exception: clustering within a designated development area pursuant to SBLDR § 9.05(C). Appellee-Applicant is correct that SBLDR § 13.14 is more specific than § 15.18 regarding development densities, but the standards and criteria of § 13.14 apply generally in the City, and the mandatory provisions regarding development density in Article 9 relate specifically to the SEQ, and therefore control over the permissive, generally applicable provisions in § 13.14.

In reaching this conclusion, we compared the following provisions:

➢ SBLDR § 13.14(C) ("On a case by case basis and as part of the Planned Unit Development application, the Development Review Board may grant an increase in residential density over base zoning density, in order to create below market rate housing"), and

➢ SBLDR § 13.14(C)(2) ("The Development Review Board may grant a density increase of no more than twenty-five percent"), with

➢ SBLDR § 9.05(A) ("The maximum development density for residential development of a parcel of land or portion of a parcel of land located in the Southeast Quadrant District shall be one point two (1.2) residential units per acre"), and

➢ SBLDR § 9.05(B) ("No parcel of land or portion thereof located in the Southeast Quadrant District shall be developed for a greater of residential units or residential lots than allowable under Section 9.05(A) above. The provisions of these Regulations which establish a minimum lot size requirement for residential development in the [SEQ] shall not supersede the requirements of Section 9.05(A) above regarding maximum residential development density"), and

➢ SBLDR § 9.08(C) ("The maximum number of residential units or lots that may be approved for a PUD shall not exceed the allowable residential development density for the property determined in accordance with Section 9.05").

Taken together, Articles 9, 13, and 15 of the SBLDR show a clear intent to limit development in the Southeast Quadrant to 1.2 residential units per acre, in order to preserve the "very special and unique resources" in that district. We recognize that our conclusion here is at odds with the DRB determination made below and the testimony offered via affidavit of the City Director of Planning and Zoning, and are mindful that "the interpretation of [zoning regulations] by the zoning board and the zoning staff 'can be determinative in a close case.'" In re Korbet, 2005 Vt. 7, ¶10, citing In re Maple Tree Place, 156 Vt. 494, 500 (1991). But as the Court did in Korbet, we find here that the facts as presently put before us warrant a conclusion contrary to that suggested by the DRB and Planning and Zoning Director. We have not been presented here with a compelling citation to counteract our interpretation of § 9.05 and have not been made aware of any prior award of a density increase under § 13.14 within the SEQ district.

Accordingly, we conclude that at trial, Appellee-Applicant will face the burden of proving that its Master Plan application in general, and Phase III of its project in particular, will not exceed a density of 1.2 residential units per acre. We specifically conclude that the Regulations do not provide for the award of additional density increases under § 13.14, due to the sensitivity of and stated goals for the SEQ district.

This matter is presently scheduled for a telephone conference next Monday, July 10th, at 1:00 PM. We hope to resolve any remaining scheduling disputes at that conference, including the scheduling of trial dates.

Done at Berlin, Vermont this 6th day of July, 2006.

_____
Thomas S. Durkin, Environmental Judge